## NATIONAL LABOR RELATIONS BOARD v. SPARKS-WITHINGTON CO. et al. (UNITED COOPERATIVE SOC. OF JACKSON, Inc., Intervenor).

### No. 8753.

Circuit Court of Appeals, Sixth Circuit.

April 16, 1941.

Joseph B. Robison, of Washington, D. C. (Robert B. Watts, Laurence A. Knapp, Frederick M. Davenport, Jr., and Stanley D. Metzger, all of Washington, D. C., on the brief), for petitioner.

Leland S. Bisbee, of Jackson, Mich. (Leland S. Bisbee, David W. Kendall, W. K. McInally, and Bisbee, McKone, Badgley & Kendall, all of Jackson, Mich., on the brief), for respondent.

Frank L. Blackman, of Jackson, Mich. (Blackman & Blackman, of Jackson, Mich., on the brief), for intervenor.

Before HICKS, SIMONS, and MARTIN, Circuit Judges.

HICKS, Circuit Judge.

Petition to enforce an order of the National Labor Relations Board against Sparks-Withington Company of Jackson, Mich., directing it to *cease and desist* from dominating or interfering with the administration of the United Cooperative Society

of Jackson, Inc., intervenor, or from contributing financial or other support to the Society; from giving effect to its contract of June 2, 1938, with intervenor with respect to rates of pay, wages, hours of employment, etc., and from otherwise restraining or coercing its employees in the right of self-organization for purposes of collective bargaining through representatives of their own choosing. The order contained the customary affirmative provisions, for withdrawal of recognition from intervenor, the posting of notices and notification of the Regional Director. The proceedings were instituted as the result of charges filed against the company by representatives of Local 62 of United Automobile Workers of America.

The Board had jurisdiction. Our question is, whether the facts support the Board's findings that respondent's conduct violated Sec. 8(1) and (2) of the National Labor Relations Act, Title 29 U.S.C., Sec. 158(1) and (2), 29 U.S.C.A. § 158(1, 2). Portions of these sections follow:

"Sec. 8 [§ 158]. Unfair labor practices by employer defined

"It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157] of this title.

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: * * *."

We quote also Section 7:

"Section 7 [§ 157]. Right of employees as to organization, collective bargaining, etc. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Respondent operated principally in Jackson, Mich., where, in four plants, it manufactured automobile horns, radio sets and electric refrigerators; and employed between 1,500 and 1,800 persons. Prior to 1937 the only employee organization in respondent's plant was a Factory Council in which executives participated. On April 12, 1937, the Jones and Laughlin case, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, outlawing such organizations as the Factory Council, was decided and about the same time there was occurring the phenomenon of industrial unrest and violence of which we took judicial notice in N. L. R. B. v. Ford Motor Co., 6 Cir., 114 F.2d 905. At about the same time the United Automobile Workers of America, associated with the Committee of Industrial Organization, was becoming active in Jackson and established there Local 62, herein called the Union, which later entered into a collective bargaining contract with respondent.

In February or March, 1937, according to the Board's witness, Blanchard, who later became President of intervenor, Lloyd Johnson, an old employee of respondent, conceived the idea of forming an organization of respondent's employees in two of its four plants for purposes of co-operative buying and of collective bargaining. Blanchard testified that his first conversation on the subject with Johnson was held with awareness of the prevailing unrest and that they "figured" they could "form an organization of our own" and "run our own show," thereby forestalling outside organizations. They called in two others, Wyant and Luxton, and the four constituted the original committee.

The Board found that "they were not immediately concerned with procuring wage increases but their purpose * * * was to form a labor organization to prevent outside organization of the horn division of the plant and to provide a method of co-operative purchasing for its members." The evidence overwhelmingly points to the dual purpose of collective bargaining and of co-operative buying and the testimony of Blanchard discloses that they hoped to strengthen the co-operative buying aspects of the proposed organization by getting a large number of members.

On February 24, 1937, the four went to Sparks, Vice President and General Manager of respondent, and Blanchard testified that he "did not seem to be any too hot about it"; that Sparks said "he would take it under consideration" but that before he could deal with an organization "it would have to be responsible and therefore we would have to incorporate." Sparks denied that he demanded incorporation and Wyant could remember no such demand. Nevertheless the Board accepted Blanchard's version. Even so, we do not think the matter constituted interference,—it was an isolated request made in the first of several meetings held with Sparks. Sparks

was no doubt thinking of the irresponsibility prevalent in the sit down strikes then in progress and feared for his own plant. However, not very long afterward he entered into an agreement with Local 62 which was unincorporated and in his public utterances in December of 1936 in his very temperate statement on the question of collective bargaining there was no hint that he considered incorporation a prerequisite for bargaining. That Wyant could not even remember a demand for incorporation indicates that he attached no importance to the request, and neither do we. In any event, incorporation was desirable and almost necessary since the organization was soon to be making contracts in connection with its co-operative buying activities.

On February 27, 1937, another meeting was held by the four with Sparks and Corbett, manager of Plants 1 and 2, at which, according to Blanchard's testimony, Sparks, without any demand from the four, for they were yet unorganized and unincorporated, voluntarily informed their committee that the company was planning certain wage increases to become effective on March 1, 1937.

Thereafter, the Committee with certain others drafted their own by-laws, employed their own attorney who helped them with their application for a charter, and on April 16, 1937, their certificate of incorporation was issued by the State of Michigan under the name "United Cooperative Society of Jackson, Inc." The attorney was paid from the funds of the Society. Under the original by-laws any employee who had been such for six months was entitled to membership. Membership was now no longer limited to Plants 1 and 2, for, as Blanchard testified, after others got wind of what was going on, they wanted in on it too. However, "executives, superintendent, foremen and sub-foremen," were made ineligible for membership on the Relations Committee. Dues were fixed at $1 per year with an application fee of 25 cents upon joining.

The parties did not meet again with plant representatives until April 21, 1937, five days after incorporation, after which on the same day the respondent posted on its bulletin boards an announcement which the Board considered significant and from which it quoted the following paragraphs in its findings:

"Prior to March 1st a group of our employees came to us advising that they would like to discuss some Sparks-Withington employees' problems with the management. As part of the results of those discussions there was put into effect hours and wage changes, as of March 1st, 1937.

"Since that time this group of employees have advised the management they have formed an organization and have asked for a couple of informal meetings, followed by a Formal Collective Bargaining Conference on Wednesday, April 21st—and as the result of these discussions with the United Co-Operative Society of Jackson, Incorporated, it has been mutually agreed as follows. * * *"

Then followed certain concessions as to rest periods, working week, overtime, etc. On April 28, following another meeting with the representatives of the Society, respondent posted a second bulletin clarifying seniority rules and announcing the abolition of the outlawed Factory Council heretofore mentioned. In addition, it was announced that certain matters, foreclosed until the first of the year by the previous bulletin, were to be left open for further negotiation.

Sparks testified that the first time he was waited upon by a Committee of Automobile Workers was on May 5, 1937. Thereafter, on July 7, 1937, and again in June, 1938, the company made substantially identical but separate contracts with the Society and with Local 62. The Board found: "The contracts recognize the respective labor organizations and the representatives of other members and contain provisions as to representation, seniority, wages and hours, and other miscellaneous matters. Foremen, assistant foremen, supervisors and confidential employees were expressly excluded from the operation of these contracts."

The Board concluded that "respondent's efforts to attribute the wage increase of March 1 to the efforts of the Society, and the number of concessions granted at the conferences of April 21 and 28, the first two conferences the Society had with respondent * * * *constituted support to the organization of the Society.*" (Italics ours.)

■■ We recognize of course that the findings of the Board as to facts if supported by the evidence are conclusive, but, as we stated in N. L. R. B. v. Empire Furniture Corp., 6 Cir., 107 F.2d 92, 93, 95, the finding must be based upon substantial evidence of such relevancy as "a reasonable

mind may accept as adequate to support a conclusion." The court is not "bound to accept findings based on evidence which merely creates a suspicion or gives rise to an inference that cannot reasonably be accepted. The statute means that the Board's findings are conclusive if supported by substantial evidence." Ballston Stillwater Knitting Co., Inc., v. N. L. R. B., 2 Cir., 98 F.2d 758, 760. We think the Board's inference that respondent's attribution of the wage increase and concessions to the Society's efforts constitute support to the Society in violation of Sec. 8(2) of the Act has no substantial foundation. At that time no other organization was negotiating with the company. There is no evidence that the Factory Council was active. There was evidence that it had been moribund for some time previous to dissolution. Local 62 did not even have a meeting with respondent until a full week after the second of these bulletins. And when it did meet negotiations proceeded rapidly and along the same lines as those with the Society and led to "substantially identical" agreements. There had been no election. So far as the evidence goes, Sparks dealt as readily with one organization as with the other, and exactly as he had stated that he would do in his speech made to all employees of the company on the day before Christmas, 1936.

The Board concluded that the bulletin we have quoted from falsely attributed the wage and hour changes of March 1 to the Society. We do not agree. The first paragraph indicates a *group of employees* came and discussed some matters prior to March 1; the second discloses that they were not then organized. Nothing could be clearer than that a group of persons and not the then nonexistent Society had held these preliminary discussions. And as we read the second paragraph, only the concessions enumerated thereafter are attributed to the negotiations with the Society as such.

We have noted that the Society had certain co-operative buying activities. As a result, in its endeavor to obtain a large membership, and during the period of admitted confusion as to what was permitted under the Wagner Act, certain foremen and other supervisory employees became members of the Society, and even passed out membership cards and solicited memberships. On this point Blanchard testified: "A. We was quite dumb; I hate to admit it, but some things that conflicted with the Wagner Labor Act that we had to correct, because at the time when we organized, not knowing how the Wagner Act read, and due to the fact that it was held up by the United States Supreme Court as to its Constitutionality; we discovered that while some foremen had gotten into the organization, we practically kicked them out and only gave them privilege cards for co-operative buying only."

The Society was incorporated on April 16. The Jones and Laughlin decision was handed down on April 12. A month and a half later, on June 2, the Society amended its by-laws to exclude from membership executives, superintendents, foremen and subforemen and thereafter they were issued cards entitling them simply to co-operative buying privileges. The amendment was proposed on May 3 and the minutes indicate that it was passed almost casually and with no fear of repercussions upon the Society or its members. The Board found that at the time the amendment was adopted the Society had secured 90% of its members or 239 as against a total of 283 on October 6. Even on the assumption that these facts reveal company interference and support, these figures, indicating less than 300 Society members of a total of 1500 to 1800 employees, negate strongly its effectiveness.

It is true that 8 or 10 supervisory employees joined the Society and solicited members, spoke favorably of it, kept membership cards on their desks, etc. It is unnecessary to detail these instances. So far as the record shows, the assistance of these persons derived from the confusion of functions of the Society in its early days rather than from any attempt on the part of the company to "dominate" or "contribute * * * support" to the Society. A few members were obtained in this manner who stated they would not have joined the Society had they known it was a collective bargaining agency. Some withdrew when they were so informed but the record is devoid of evidence that the company dominated the Society, interfered with its internal functioning, contributed any money to it or any appreciable support within the meaning of the Act. The minutes of the Society indicate that the meetings were held free from any coercion or interference and it appears that the members freely set up committees for discussion of their rights and grievances with the company.

The fact that some members, solicited by foremen, withdrew when they learned the

real nature of the Society is the surest evidence that the company was not dominating it. There is no evidence that the management knew of or countenanced these early solicitations to membership by its supervisory employees. See N. L. R. B. v. Empire Furniture Co., supra (107 F.2d page 94). In fact, Edwin Schnell, Master Mechanic, testified "we have been told many times that we should not interfere with anybody belonging to any organization that they wanted to belong to." A foreman, V. A. Hanson, testified that "it was stressed that it didn't make any difference what the men belonged to."

The Board's witness, Mildred Hawkes, testified that when she was asked to join the Society by a foreman, she refused and felt under no obligation to join. The witness Inge's testimony was to the same effect. There was no evidence of discriminatory treatment because of membership in Local 62 and the Board's order dismissed the complaint in so far as violations of Sec. 8(3) were concerned. The whole record leaves the impression of singular freedom and independence of employees in regard to Union or Society membership.

The point is made that foreman Dean Chambers and Edward Masters who "has charge of the pipe fitting and such maintenance work in Plant 4," were members of the first "bargaining" committee and that Masters was subsequently elected to the Society's General Committee. The Bargaining Committee was set up at the April 23 meeting of the Society, before the amendment to the by-laws of June 2. There is no evidence of Chambers' subsequent participation. The only evidence that Masters was a supervisory employee was in the testimony of Nelson Harland, quoted above, that Masters "had charge of pipe fitting, etc." which is insufficient to prove that he supervised any employee.

There were in evidence isolated instances, unconnected with the Society, through which the Board found Respondent sought to discourage membership in the Union.

Darling, one of the employment managers, approached one Holt and offered to pay his dues in the Union in order that he might report the names and number of the Union members. Holt testified that he was already a member, although he didn't inform Darling. He reported to Darling the number but refused to disclose their names, without any untoward consequences to himself.

Lawton, an employee in the horn division, was allowed to take some materials and tools for use at his home, by Allread, Superintendent of Production. Following this favor and shortly after Lawton started wearing a Union button, Allread asked Lawton "why he kept working against him?" There was no further explanation of this and similar remarks, but the Board concluded that Allread was referring to Lawton's Union activities and was seeking to discourage him from continuing his membership in the United. This is but a surmise based upon flimsy evidence.

Darling rehired Nelson Harland, a Union member after a protracted lay-off, saying, "You are the oldest man on the list and next to the last to be called in, that is what the Union has done to you."

Arthur Poole, the Paymaster, when asked for an advance by Edgar Lawton, who was wearing a Union button, pointed out to him that he could save on dues by being a member of the Society, and would not have to ask for advances and indicated that the Company "backs it up."

These incidents, in the light of what we have noted about the Company's hands-off policy, sift down simply to instances of personal zealousness and individual bias against the Union on the part of two supervisory employees, Poole and Darling. There is no evidence that their activities or statements represented company policy; there is positive evidence to the contrary. The statements involve little more than expressions of individual opinion, which, so far as the record goes, left the employees unmoved. As stated in N. L. R. B. v. Ford Motor Co., supra, the free expression of opinion is not necessarily a violation of the Act.

The petition for an order of enforcement is denied.