**PITTSBURGH S. S. CO. v. NATIONAL LABOR RELATIONS BOARD.**

No. 10372.

United States Court of Appeals
Sixth Circuit.

Feb. 17, 1950.

Writ of Certiorari Granted May 8, 1950.

See 70 S.Ct. 842.

732

Nathan L. Miller, Cleveland, Ohio (Nathan L. Miller, Lee C. Hinslea, Lucian Y. Ray, Cleveland, Ohio, on brief, Leckie, McCreary, Schlitz & Hinslea, Cleveland, Ohio, of counsel), for petitioner.

Robert L. Stern, Washington, D. C. (Robert L. Stern, David P. Findling, A. Norman Somers, Frederick U. Reel, and Harvey B. Diamond, Washington, D. C., on brief), for respondent.

Before ALLEN, McALLISTER and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

This case is before the court on remand from the Supreme Court, 337 U.S. 656, 69 S.Ct. 1283, which reversed a judgment of

this court [167 F.2d 126] denying enforcement of an order of the National Labor Relations Board based upon unfair labor charges. The Supreme Court remanded the case to this court for consideration of the applicability and possible effect both upon Board procedures and the scope of judicial review of Board orders of the Administrative Procedure Act, 60 Stat. 237, 5 U.S.C. § 1001 et seq., 5 U.S.C.A. § 1001 et seq., and the Taft-Hartley Act, 61 Stat. 136, 29 U.S.C.Supp. I, § 141 et seq., 29 U.S. C.A. § 141 et seq., enacted between issuance of the Board's order and this court's decision.

The applicable provisions of the Administrative Procedure Act are contained in § 1006(c), 1009(a), (c) and (e). They relate to evidence and judicial review. The relevant sections of the Taft-Hartley Act are contained in § 158(c), 160(b), (c) and (e). They relate not only to rules of evidence and procedure in the trial of labor cases and review in this court, but also to the expression of opinion and to the reinstatement and payment of back pay to employees suspended or discharged.

Both of these statutes are remedial. Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 10, 61 S.Ct. 77, 85 L.Ed. 6. A remedial provision is applicable to pending actions. Ex parte Collet, 337 U.S. 55, 69 S.Ct. 944, 959. In accordance with this rule since the decision of the Board preceded the enactment and the review was subsequent to the enactment, the Administrative Procedure Act and the Taft-Hartley Act were applicable to the judicial review.

The Board concedes that the review in this court is controlled by the two statutes, but contends that the scope of judicial review as to findings of fact has in no way been affected by them. We think this contention is erroneous. The provisions of § 10(e) of the Administrative Procedure Act that the reviewing court shall hold unlawful and set aside agency action, findings and conclusions found to be "unsupported by substantial evidence" and that in making this determination the court shall "review the whole record," is new. Moreover, the rules concerning evidence have been expressly changed by both the Taft-Hartley Act and the Administrative Procedure Act. Section 10(b) of the Wagner Act provided that "rules of evidence prevailing in courts of law or equity shall not be controlling," and the Board's findings of fact were made conclusive by that statute [§ 10(e)] if they were "supported by evidence." In the Taft-Hartley Act [§ 10(b)] Congress eliminated this language and substituted a provision that hearings "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States." Section 10(c) of the Wagner Act was amended to require decisions of the Board to be supported by "the preponderance of the testimony taken," and § 10(f) was amended to provide that the findings of the Board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive.

Section 7(c) of the Administrative Procedure Act is new and emphatic. It provides as follows:

" * * * Any oral or documentary evidence may be received, but every agency shall as a matter of policy provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence and no sanction shall be imposed or rule or order be issued except upon consideration of the whole record or such portions thereof as may be cited by any party and as supported by and in accordance with the reliable, probative, and substantial evidence. * * *"

These statutes were designed to eliminate the wholesale use of hearsay, the drawing of expert inferences not based upon evidence, and the consideration of only one part or one side of the case.

Moreover, § 10(c) of the Taft-Hartley Act contains the specific provision that no order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay if such individual was suspended or discharged for cause. Section 8(c) added:

"The expressing of any views, argument, or opinion, or the dissemination thereof,

whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."

Sections 8(c) and 10(c) cover facts such as those revealed in this case, for the Board ordered reinstatement with back pay of Howard Shartle, who had been discharged for cause, and also held that the expression of views in the Ferbert letters was evidence of an unfair labor practice, although these letters contain no threat of reprisal or force or promise of benefit.

The conclusion that the Administrative Procedure Act and the Taft-Hartley Act were intended to effect a change in procedure before the Board and to create

more effective judicial review is inescapable in light of the legislative history. Thus both the Senate Committee Report and the House Committee Report on the Administrative Procedure Act contained the following language:

"The requirement of review upon 'the whole record' means that courts may not look only to the case presented by one party, since other evidence may weaken or even indisputably destroy that case." (Senate Document No. 248, 79 Cong. 2d Sess.)

In the Taft-Hartley Act (80th Cong.), similar provisions were adopted applying exclusively to Labor Board decisions. These have been summarized above, and they were explained in the Report of the Conference Committee Managers, No. 510, p. 53.[1]

1. "(6) The House Bill provided, in section 10(b), that proceedings before the Board should be conducted, so far as practicable, in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure. The Senate amendment retained the language of the present act, which provides that the rules of evidence prevailing in the courts shall not be controlling. The reason for this provision in the House bill was explained in full in the committee report on the bill. If the Board is required, so far as practicable, to act only on legal evidence, the substitution, for example, of assumed 'expertness' for evidence will no longer be possible. The conference agreement in section 10(c) contains this provision of the House bill.

"(7) In section 10(c) the House bill provided that the Board should base its decisions upon the 'weight of the evidence.' The Senate amendment retained the present language of the act, permitting the Board to rest its orders upon 'all the testimony taken.' The conference agreement provides that the Board shall act only on the 'preponderance' of the testimony— that is to say, on the weight of the credible evidence. Making the 'preponderance' test a statutory requirement will, it is believed, have important effects. For example, evidence could not be considered as meeting the 'preponderance' test merely by the drawing of 'expert' inferences therefrom, where it would not meet that test otherwise. Again, the Board's decisions should show on their face that the statutory requirement has been met—they

should indicate an actual weighing of the evidence, setting forth the reasons for believing this evidence and disbelieving that, for according greater weight to this testimony than to that, for drawing this inference rather than that. Immeasurably increased respect for decisions of the Board should result from this provision."

"(14) Under the language of section 10(e) of the present act, findings of the Board, upon court review of Board orders, are conclusive 'if supported by evidence.' By reason of this language, the courts have, as one has put it, in effect 'abdicated' to the Board [N. L. R. B. v. Standard Oil Company, 138 Fed.2d 885 (1943)]. See also: Wilson & Co. v. N. L. R. B. [126 Fed.2d 114 (1942)], N. L. R. B. v. Columbia Products Corp. [141 Fed.2d 687 (1944)], N. L. R. B. v. Union Pacific Stages, Inc., [99 Fed.2d 153]. In many instances deference on the part of the courts to specialized knowledge that is supposed to inhere in administrative agencies has led the courts to acquiesce in decisions of the Board, even when the findings concerned mixed issues of law and of fact [N. L. R. B. v. Hearst Publications, Inc., 322 U.S. 111; Packard Motor Car Co. v. N. L. R. B., decided March 10, 1947), or when they rested only on inferences that were not, in turn, supported by facts in the record (Republic Aviation v. N. L. R. B., 324 U.S. 793; Le Tourneau Company v. N. L. R. B., 324 U.S. 793.

"As previously stated in the discussion of amendments to section 10(b) and section 10(c), by reason of the new language concerning the rules of evidence and the preponderance of the evidence, presumed

■ With reference to the right of free speech the legislative history shows that the amendment embodied in § 8(c) of the Taft-Hartley Act was specifically intended to prevent the Board from using unrelated non-coercive expressions of opinion on union matters as evidence of a general course of unfair labor conduct.[2]

expertness on the part of the Board in its field can no longer be a factor in the Board's decisions. While the Administrative Procedure Act is generally regarded as having intended to require the courts to examine decisions of administrative agencies far more critically than has been their practice in the past, by reason of a conflict of opinion as to whether it actually does so, a conflict that the courts have not resolved, there was included, both in the House bill and the Senate amendment, language making it clear that the act gives to the courts a real power of review.

\* \* \* \* \* \*· \*

"The Senate amendment provided that the Board's findings with respect to questions of fact should be conclusive if supported by substantial evidence on the record considered as a whole. The provisions of section 10(b) of the conference agreement insure the Board's receiving only legal evidence, and section 10(c) insures its deciding in accordance with the preponderance of the evidence. These two statutory requirements in and of themselves give rise to questions of law which the courts will hereafter be called upon to determine—whether the requirements have been met. This, in conjunction with the language of the Senate amendment with respect to the Board's findings of fact—language which the conference agreement adopts—will very materially broaden the scope of the courts' reviewing power. This is not to say that the courts will be required to decide any case de novo, themselves weighing the evidence, but they will be under a duty to see that the Board observes the provisions of the earlier sections, that it does not infer facts that are not supported by evidence or that are not consistent with evidence in the record, and that it does not concentrate on one element of proof to the exclusion of others without adequate explanation of its reasons for disregarding or discrediting the evidence that is in conflict with its findings. The language also precludes the substitution of expertness for evidence in making decisions. It is believed that the provisions of the conference agreement relating to the courts' reviewing power will be adequate to preclude such decisions as those in N. L. R. B. v. Nevada Consol. Copper Corp. (316 U.S. 105) and in the Wilson, Columbia Products, Union

Pacific Stages, Hearst, Republic Aviation, and Le Tourneau, etc., cases, supra, without unduly burdening the courts. The conference agreement therefore carries the language of the Senate amendment into section 10(e) of the amended act."

2. Senate Report No. 105, page 23:
"Section 8(c): Another amendment to this section would insure both to employers and labor organizations full freedom to express their views to employees on labor matters [provided employers and unions refrain from threats of violence, intimation of economic reprisal, or offers of benefit]. The Supreme Court in Thomas v. Collins (323 U.S. 516) held, contrary to some earlier decisions of the Labor Board, that the Constitution guarantees freedom of speech on either side in labor controversies and approved the doctrine of the American Tube Bending case [134 Fed.(2d) 993]. The Board has placed a limited construction upon these decisions by holding such speeches by employers to be coercive if the employer was found guilty of some other unfair labor practice, even though severable or unrelated (Monumental Life Insurance, 69 N.L.R.B. 247) or if the speech was made in the plant on working time (Clark Brothers, 70 N.L.R.B. 60). The committee believes these decisions to be too restrictive and, in this section, provides that if, under all the circumstances, there is neither an expressed or implied threat of reprisal, force, or offer of benefit, the Board shall not predicate any finding of unfair labor practice upon the statement. The Board, of course, will not be precluded from considering such statements as evidence."

House Report No. 245, page 33:
"Section 8(d) (1) \* \* \* Although the Labor Board says it does not limit free speech, its decisions show that it uses against people what the Constitution says they can say freely. Thus, if an employer criticizes a union, and later a foreman discharges a union official for gross misconduct, the Board may say that the official's misconduct warranted his being discharged, but 'infer,' from what the employer said, perhaps long before, that the discharge was for union activity, and reinstate the official with back pay. It has similarly abused the right of free speech in abolishing and penalizing unions of which it disapproved but which work-

The intent clearly to establish the right of free speech was further emphasized in House Conference Report No. 510, page 45.[3]

The Board concedes that § 8(c) of the Taft-Hartley Act as to freedom of speech has immediate effect in this case, for it agrees that the Ferbert letters have been "immunized" by this provision and that no order of the Board could restrain the use in the future of such statements as the Ferbert letters. It makes this concession on the ground that the reviewing court can not restrain action which, under the 1947 Act, is no longer illegal. This means that the letters can not be considered to constitute unfair labor practice.

Certain courts of appeals for which we have high respect have held that the Labor Management Relations Act has not changed the scope of judicial review. Cf. Eastern Coal Corp. v. National Labor Relations Board, 4 Cir., 176 F.2d 131; Victor Mfg. & Gasket Co. v. National Labor Relations Board, 7 Cir., 174 F.2d 867; National Labor Relations Board v. Continental Oil Co., 10 Cir., 1950, 179 F.2d 522; National Labor Relations Board v. Universal Camera Corp., 2 Cir., 1950, 179 F.2d 749; National Labor Relations Board v. Minnesota Mining & Mfg. Co., 8 Cir., 1950, 179 F.2d 323; National Labor Relations Board v. Booker, 5 Cir., 1950, 180 F.2d 727. But these holdings are at variance with National Labor Relations Board v. Caroline Mills, Inc., 5 Cir., 167 F.2d 212, 213, and with National Labor Relations Board v. Tappan Stove Co., 6 Cir., 174 F.2d 1007, 1008, in which this court held that the

Taft-Hartley Act broadened the Wagner Act as to scope of judicial review.

■ We adhere to the decision in National Labor Relations Board v. Tappan Stove Co., and also point out that the case here presented is stronger in favor of the petitioner's contention than most of the cases relied on by the Board, which relate to the Taft-Hartley Act alone. If, as contended, Congress failed in the Taft-Hartley Act to enlarge the scope of judicial review because the requirement of substantial evidence to support the Board's findings added nothing in view of previous decisions of the Supreme Court, no such contention can be maintained with reference to the Administrative Procedure Act. In this statute the procedural requirements made by the Board and by the reviewing court not only are very specific but they add new tests to be applied to the validity of agency action. Every administrative agency is expressly prohibited from imposing any sanction and issuing any rule or order "except upon consideration of the whole record or such portions thereof as may be cited by any party and as supported by and in accordance with the reliable, probative, and substantial evidence." The reviewing court is required [§ 10(e)] to hold unlawful and set aside agency action, findings, and conclusions not in accordance with law and unsupported by substantial evidence, and in making its determination it is also required to review the whole record. These mandatory provisions define and make specific the requirements of judicial review and extend them beyond the requirements of the Wagner Act.

ers wished as their bargaining agents. The bill corrects this, providing that nothing that anyone says shall constitute or be evidence of an unfair labor practice unless it, by its own express terms, threatens force or economic reprisal. This means that a statement may not be used against the person making it unless it, standing alone, is unfair within the express terms of sections 7 and 8 of the amended act."

3. "Both the House bill and the Senate amendment contained provisions designed to protect the right of both employers

and labor organizations to free speech. * * * The practice which the Board has had in the past of using speeches and publications of employers concerning labor organizations and collective bargaining arrangements as evidence, no matter how irrelevant or immaterial, that some later act of the employer had an illegal purpose gave rise to the necessity for this change in the law. The purpose is to protect the right of free speech when what the employer says or writes is not of a threatening nature or does not promise a prohibited favorable discrimination."

We assume that evidence admitted before the Board may be relied on to support its decision, and also may be relied on by petitioner. Although not expressly directed, we also assume that we are expected, in light of the new enactments, to reconsider the record, for the Supreme Court will not ordinarily pass upon a case until a lower court has made findings upon the facts. National Labor Relations Board v. Donnelly Garment Co., 330 U.S. 219, 237, 67 S.Ct. 756, 91 L.Ed. 854. When the Supreme Court remanded the instant case with the direction to consider the effect of these statutes, we think it did not expect us to pass upon that question *in vacuo*. Necessarily the effect of these statutes upon the case means their effect as applied to the facts of the case. We therefore proceed to inquire, upon a consideration of the whole record, whether the order sought to be enforced is supported by the reliable, probative, and substantial evidence and is in accordance with law.

The entire case is bottomed by the Board on what it finds to be the adoption by the petitioner of a general course of coercive conduct prior to the labor election of June, 1944, to which it had consented. The petitioner contends that no substantial evidence to this effect exists.

The Ferbert Letters.

The finding that a general course of coercive conduct existed is based largely upon the letters signed by petitioner's president, A. H. Ferbert, and sent to each of petitioner's unlicensed employees. Petitioner had no previous record of labor trouble or union hostility. Cf. National Labor Relations Board v. J. L. Brandeis & Sons, 8 Cir., 145 F.2d 556, 557; Martel Mills Corp. v. National Labor Relations Board, 4 Cir., 114 F.2d 624. It is undisputed that petitioner addressed a letter to all of its supervisors calling attention to the coming election and instructing them to display complete impartiality with reference to union affairs. It is undisputed, and the examiner found that petitioner addressed to every one of the 2,000 unlicensed employees two letters (the Ferbert letters), one dated May 2, 1944, and one June 1, 1944. The first letter stated that "The

Company recognizes the right of each employe to join any Union he may select and such membership will not affect his position with the Company. On the other hand, the Company feels that it should be made clear to you that it is not necessary to join any labor organization if you do not so choose." The second letter made substantially the same statement, and also stated, "No one must threaten you in this election. It is your privilege to make up your own mind as to how you should vote."

The examiner found:

"The suggestion that the employees' selection of the Union would result in a forfeiture by the employees of their opportunities for promotion represented a misstatement of the Union's position in that respect. As shown by the uncontradicted and credited testimony of Jack Lawrenson, the Union's vice-president, it is the policy of the Union to allow promotions of qualified seamen under the circumstances indicated in the letter, and it is only an unfilled vacancy arising after any such promotion has been made that must be filled from the rotary hiring list. Ferbert's statements concerning the wage stabilization laws, while not literally inaccurate, nevertheless contained implications which were misleading. Their formulation was such as to convey the impression that collective bargaining would be fruitless since all wage increases had been banned by the governmental wage stabilization policy. Actually, of course, the fact that wages generally were frozen during the war period did not preclude wage adjustments under certain circumstances. Moreover, the letters gave an erroneous impression that collective bargaining was limited to the question of wages, ignoring other conditions of employment in which collective bargaining can be a factor, such as working rules and the adjustment of grievances."

Upon this ground the examiner found that the letters formed an integral part of a general course of coercive conduct.

These findings, which were approved by the Board, in important particu-

lars are supported by no evidence. The assertion that the letters give an erroneous impression that collective bargaining is limited to the question of wages can not be maintained in view of the express statement in the letter dated May 2, 1944. In calling attention of the employees to the election, the first Ferbert letter states that the question to be decided is whether the unlicensed employees are to have for their exclusive bargaining agent the N. M. U. (C. I. O.) "with the sole and exclusive right to represent you in all matters regarding rates of pay, wages, hours of employment, and other conditions of employment."

The statement in the letter of May 2, 1944, with reference to the question of wage rates being in the hands of the Government during the war emergency was true. The statement in the letter of June 1, 1944, with reference to rotary hiring was true. In its pertinent portions it read:

"You should carefully consider some of the issues which have been referred to by the Union * * * one is 'rotary hiring.' To make sure that you understand what this means * * * it means that you are entitled to return to the same ship in the spring that you laid up the previous fall, but if you are following an engineer or mate, and want to work with him, and he is promoted, he cannot hire you. This is called 'fleet seniority.' Again, if you ship out as a deckwatch, you cannot be promoted to a watchman or lookout when there is a vacancy. The vacancy must be filled by the man at the top of the list at the Union Hall. If you do not go back to the same ship in the spring, you register at the Union Hall and work your way up to the top of the list, and take the first opening for the position you are seeking, whether it be in our fleet or some other fleet. If you refuse the position, then you go to the bottom of the list."

While the union official, Lawrenson, testified positively that this was "a downright misstatement," Lawrenson's conclusion is not supported by reliable, probative, and substantial evidence. The letter is shown to be squarely correct by the written union contract, which provides that replacements "shall be hired through the offices of the Union, as vacancies occur." Lawrenson's testimony so far from being uncontradicted, as found by the examiner, was contradicted not only by the written union contract, but by Lawrenson himself. The examiner found: " * * * it is the policy of the Union to allow promotions of qualified seamen under the circumstances indicated in the letter." Lawrenson's testimony contradicts this finding. He was asked whether a wheelsman on the Steamer F. B. Morse, who wanted to shift to the Steamer A. B. Widener to follow a mate who had been promoted, could do that under the union system. Lawrenson answered: "We have no provision, because we never came across those situations. We have no provisions in the shipping rules that if a man wants to follow a certain mate he may do so." He then went on to say that it might be arranged if the man at the top of the list was willing. He was further questioned as follows:

"Q. * * * You say you are quite sure that might be arranged. But that isn't the rule, is it, if there is a vacancy, and the man on the Morse, who is not on your list wants to go to the Widener, because the mate is there, you couldn't let him go there because that would deprive the top man on your list from having a job; wouldn't it? A. It would not, because there is a vacancy—

"Q. Now, if the top man on the list wanted the Widener job, and not the Morse, you would give him the Widener job; wouldn't you? A. Definitely."

■ Three witnesses testified, and no positive testimony to the contrary appears, that at the meeting of its captains and chief engineers in Cleveland, in March, 1944, just before the opening of navigation, the petitioner unequivocally instructed its officers that they must maintain strict impartiality and not interfere with union activities as long as such activities did not conflict with discipline or proper operation. In a letter addressed to the captains on May 31, the captains were instructed that "There must be no partiality." The examiner concluded that the fact that instructions were given to the supervisors to insure a fair election

did not absolve petitioner of liability since the instructions "were never communicated to the employees," and this conclusion was upheld by the Board. This was error as a matter of law. Through individual letters the company instructed the men positively as to their rights. It was under no obligation to send the men copies of its instructions to the masters. When the company wrote the men, "It is your privilege to make up your own mind as to how you should vote," and "No one must threaten you in this election," it fully communicated its attitude, and in effect offered its protection.

Moreover, the instructions were acted upon. We have here a case involving 73 ships with 2,000 unlicensed employees and 596 supervisors. Complaint is made as to occurrences on only seven ships. The seven principal witnesses who attack petitioner's conduct on these ships are all union organizers, certainly not disinterested witnesses. Only four unlicensed men, nonorganizers, appeared for the Board as supporting witnesses. No complaint whatever has been made as to some 540 supervisors on 66 ships.

The Board contends that these facts are immaterial. While coercive acts actually performed even on one ship would render the employer liable on this record, the background is significant in favor of the employer. Not only is there a total failure to bring home to the management knowledge of the controversies on the few ships involved, but the positive acts of management establish absence of general coercive intent.

The Discharge Of Shartle.

■ We question whether the reinstatement of Shartle could properly be ordered even if the record supported the Board's order, in view of the enactment of § 10(c) of the Taft-Hartley Act (Cf. Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327); but we deem it unnecessary to base our holding upon this ground, for we search the record in vain for "reliable, probative, and substantial evidence" [5 U.S.C. § 1006 (c), 5 U.S.C.A. § 1006(c) ] to support the finding that Shartle was discharged because of union activities.

In contemplation of the election, permission was given for the presence of a union organizer upon each of the 73 ships. Out of some 2,000 men, Shartle is the only organizer found to have been discharged because of union activities.[4] He was employed from March 31 to April 24, 1944, when he was discharged on the ground of incompetency by the first mate, Dobson, the executive officer of the Steamer Irving S. Olds. Shartle possessed an A. B. certificate and was hired as a watchman. In this position he had various duties. He was to keep watch, to supervise small groups of deck hands in carrying out the orders of the first mate and also of the second and third mates who were usually in immediate charge of the operations. He was to handle the electric winches which control the speed of the ship in stopping to load and unload. He was personally required to supervise and to do a large amount of painting. He was discharged because he was incompetent in all these respects and also because he was late on various occasions and did not notify his superior officers. The incompetency with reference to the winch was important because of the possibility that men upon the deck would be injured if the lever were carelessly left on the automatic control. While the examiner comments that no one had ever been discharged for such a fault, it was uncontradicted that another man had been demoted for negligence in this particular on a single occasion, with loss of $45 per month pay. Shartle denied that he had been negligent in the operation of the winch, although Chrobak, the second mate, testified that on one occasion he took over the controls just in time to prevent the breaking of the wire and possible injury. In spite of Shartle's categorical denial of this incident, the examiner found that it had occurred.

---

4. Vogel was found to have been discharged, but the discharge, as the examiner found, "was rescinded."

Shartle admitted that he did not know how to splice cable, and that on one occasion, after splicing had been assigned to him, it was taken away and given to another man to finish. The examiner found that the "isolated mistake in the operation of the winch" and Shartle's "unfamiliarity with the splicing technique, of rarely required application" did reflect "a certain lack of experience and skill." The examiner also said that it might even be assumed that in certain other respects, such as his ability to paint or his ability to lead the deck hands Shartle may have fallen short of the degree of skill and know-how possessed by old-line seamen. This was a mild description of the testimony with reference to Shartle's incompetence. The second mate said in effect that Shartle was lazy, "his partner would do three-fourths of the work." He said he reprimanded Shartle for this and, instead of improving, Shartle "razzed" the other men for going so fast, and asked them if they were doing piecework. The second mate reported this to Dobson, who said that he would let it run awhile and see how things "panned out." Dobson testified that Shartle reported late for duty twice; that he went to Cleveland without consulting the first mate, and he would come back half an hour to forty-five minutes late in the morning and say nothing to any one.

The examiner found Shartle negligent in the operation of the winch, but minimized it as being an isolated incident. However, the record clearly shows this was not a single incident. Hewer, the third mate, said that on a number of occasions both before and after this incident he "took the controls from Shartle" because he "didn't figure he was competent to handle them." Moreover, Hewer testified that Shartle was not trustworthy as a watchman. He reprimanded Shartle for his poor paint-

ing and advised him to do a better job and supervise the men more closely. The examiner questioned the discharge on the ground that the first mate did not consult the other mates before discharging Shartle. Such consultation was not necessary for the first mate exclusively had the power to discharge men; but this finding is incorrect because it is undisputed that Dobson asked Hewer, the third mate, shortly before the discharge, how Shartle had been getting along with his work, and Hewer replied that the work could be improved in a number of ways.

We bear in mind that Shartle denied all of these delinquencies, but he also denied the incident of the winch, which was found by the examiner to have taken place. In face of this denial, it is difficult to understand how Shartle's other testimony could be considered entirely credible, especially when it was contradicted by several witnesses.

Since the examiner considered that the incompetence shown was unsubstantial, he concluded that Shartle was discharged for union activity. It is undenied that neither the first mate nor the captain mentioned the union to Shartle at the time of his discharge. Also there is not a shred of testimony with reference to coercion or restraint of Shartle, who does not claim that he was in any way hindered in his organizing.

Certain wholly incompetent testimony was admitted to the effect that Shartle was discharged because of union activity.[5] After his discharge Shartle talked to the men on the ship, the electricians, the firemen, the oilers, the coalpassers, the steward, the second cook, the porter, the deck hands, the deck watch, and the watchmen, and asked them whether he was competent. He said they assured him that he was, and that he was discharged for union

---

5. Hearsay testimony was repeatedly admitted by the examiner over objection, and was made the basis of important findings. Hearsay testimony to the effect that Captain Wallace intended to discharge George W. Anderson because he was a union man was detailed at length in the intermediate report. Anderson was never discharged. The examiner also relied on hearsay testimony to the effect that Zyp, an employee of petitioner without authority to discharge men had recommended to Captain Brinker the discharge of Lee. Lee was not discharged.

activity. Reading the case in the light of the whole record, we conclude that Shartle was discharged for cause and that the finding that he was discharged because of union activity is not supported by reliable, substantial, and probative evidence. Cf. National Labor Relations Board v. Riverside Mfg. Co., 5 Cir., 119 F.2d 302, 307.

Based on the record in its complete setting, the other incidents held to constitute a general course of coercive action are at their worst sporadic cases of individual anti-union bias on the part of certain licensed employees. When viewed on the record as a whole, they are cases not of coercion but of mutual tension between aggressive organizers and the officials dealing with them. It is undenied that the tension was created or largely contributed to by the organizers themselves. Thus Lee, who objected to profane expressions of his captain, admitted that both he and the captain used profane words. The disturbance in these isolated instances can not rightly be ascribed to a policy emanating from management which was not shown by this record to be acquainted with any one of the incidents so heavily relied on by the Board.

Not one of the three principal union organizers, Lee, Babin and Weissflog, claims to have been prevented from engaging in union activities. Under the general course of conduct in fact adopted by the employer these men were allowed, as were the organizers on all of the 73 ships, to engage in a ten-weeks' intensive campaign on board ship, to use the bulletin boards, to deliver literature, and actively to talk unionism to the men. None of the three was threatened with discharge. They contend that their activities were unduly limited; but each of them admits being reprimanded on the ground that he had carried his organizing into a forbidden part of the ship or to excessive limits. Weissflog says that he was told not to organize in the mess hall

and in the firemen's quarters. Lee says that his captain severely reprimanded him for driving men off the ship by his importunities. The examiner finds that a seaman who corroborated the captain's testimony that Lee had been driving men from the ships "admitted that Lee had not in fact bothered him." But this finding was exactly contrary to the testimony.[6]

■ Lee admitted baiting the captain in arguments, and while he denounced the captain's language, he admitted using profane language himself. Babin said that he was censured for bothering the men when working, and was ordered by the chief engineer to stay out of the engine room and the firemen's quarters. He said that he went into the engine room because it was his duty to mark the soundings and to tell the engineers when to pump. Both the chief engineer and the captain said that the sounding board is not in the engine room, but in the fantail. Orders as to pumping were given by the master or made by telephone. On the whole record it is incredible that this was not the case on a modern ship. The abuse seems to have been mutual between organizers and officers, and in any case mere name-calling, particularly when engaged in on both sides, does not amount to a violation of the statute.

■ The examiner disbelieved the testimony of the captains as to the restrictions imposed for the reason that rules as to where the organizers could carry on their work were not promulgated by the company. It is undisputed that instructions had been given to the masters to permit organizing to be carried on as long as it did not interfere with discipline or proper operation. It was impossible for a home office to police 73 ships out on the Great Lakes and to frame rules which would take care of every situation. The employer's instruction was reasonable and required the captains to frame and enforce the prop-

6. "Trial Examiner Leff: You said Lee was bothering you?
"The Witness: He was at our heels all the time. He said, 'This is your last chance to get in the union and after they get control of the lakes we would be out.' I said I didn't care if I was out or not. He was bothering us all the time. We just quit when we went up the ladder. Fights make it tough for the next watch."

er rules. On the whole record the restrictions were justifiable. In any case they were made and the controversies complained of took place without evidence of the slightest knowledge on the part of petitioner's management. The case is thus wholly differentiated from H. J. Heinz Co. v. National Labor Relations Board, 311 U. S. 514, 61 S.Ct. 320, 85 L.Ed. 309. There is no evidence that the supervisors who engaged in controversy represented the company in what they said about the union. In fact there is cogent evidence to the contrary in all the proven acts of management. Cf. National Labor Relations Board v. Sparks-Withington Co., 6 Cir., 119 F.2d 78.

We think that to ignore the complete absence of union trouble on 66 ships where the positive instructions were that the rights of the men should be protected and where the basis of the holding against the employer is that it engaged in a general course of anti-union conduct, is to ignore the mandate of the two statutes that decision shall be based upon "the record considered as a whole."

The decree of enforcement is denied.