**LAWSON MILK COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 14949.

United States Court of Appeals
Sixth Circuit.

May 28, 1963.

Bruce W. Bierce, Akron, Ohio, Brouse, McDowell, May, Bierce & Wortman, Akron, Ohio, on brief, for petitioner.

Elliott Moore, N. L. R. B., Washington, D. C., Stuart Rothman, General Counsel, Dominick L. Manoli, Associate, General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Allison W. Brown, Jr., Attorney, N. L. R. B., Washington, D. C., on brief, for respondent.

Before CECIL, Chief Judge, and WEICK and O'SULLIVAN, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Petitioner, Lawson Milk Company, sought review, and respondent, National Labor Relations Board, sought enforcement of an N. L. R. B. order finding petitioner guilty of violating subsections (1) (2) and (3) of Section 8(a) of the National Labor Relations Act (29 U.S. C.A. § 158(a) (1) (2) and (3) ). The violation considered by this opinion consisted of Petitioner's failure to recall to work a part time employee, Myrtle Cobb, allegedly for union activities. Petitioner was ordered to offer employment to the said Cobb and to pay her such wages as she may have lost because of petitioner's alleged discriminatory failure to rehire her (Section 8(a) (3)). Petitioner's petition for review challenged the legality of other violations found by the Board's order but, on argument here, such challenges were withdrawn. We deal only with the Cobb affair.

Lawson Milk Company, of Cuyohoga Falls, Ohio, manufactures and distributes dairy products and bakery goods, and at one time manufactured and sold candy. In the early months of 1961, the Teamsters Local Union 497 sought to organize and represent Lawson Milk Company's employees. An N. L. R. B. election was held on May 17, 1961. The union lost the election. The atmosphere of, and methods employed in, the pre-election campaign is best characterized by a post-election letter sent by an executive officer of the Teamsters Local to petitioner's personnel director on May 19, 1961, which reads as follows:

"I would like to express my appreciation for the manner in which you conducted yourself during the efforts of Local No. 497 to organize your people. In spite of our loss, it was nice getting acquainted and doing business with you on a business-like basis.

"In reference to my committee members, we are hoping that no drastic action will be taken by the Lawson Company, which would constitute a big problem and would obligate me legally.

"Your good judgment in this matter will be greatly appreciated."

Myrtle Cobb, whose complaint initiated the unfair labor charges against petitioner, had worked on and off for the company since November, 1955. She was rather steadily employed until April of 1959, when petitioner's candy department was discontinued. Thereafter, her employment was sporadic and part time. She was called in for work on May 5, 1961, and laid off on June 3, 1961, with eighteen other part time employees. It is conceded that this layoff was for legitimate reasons. Mrs. Cobb was not thereafter called in for work by petitioner, and on August 1, 1961, she filed unfair labor practice charges against Lawson Milk Company.[1] On September 8, 1961, presumably after some investigation by N. L. R. B. agents, she filed an amended charge, this time alleging that her layoff on June 3, 1961, and the company's failure to rehire were because of her union activity and membership. The amended charge was further expanded to cover other alleged unfair labor practices, viz; that the company had threatened to discharge an employee for distributing and soliciting the signing of union membership cards, and that the company had set up and supported a union-company grievance committee and made promises of wage increases in a pre-election speech. On these matters, there were some factual issues made. However, the company dissolved the allegedly management-inspired and controlled committee. The employee who was allegedly threatened with discharge for soliciting the signing of union cards[2] was never discharged or disciplined for what she did. She was rehired and continued as a company employee. The contents of the campaign speech was a matter of dispute.[3]

The basis for the finding that the failure to recall employee Cobb was discriminatory and was inspired by her union activities are the following facts. In February and March of 1961, employee Cobb contacted the Teamsters Local and obtained some union membership cards which she gave to another employee to

1. In this first complaint, she did not claim that failure to rehire her was because of her union activities; she complained that the positions of some four of the women who were laid off on June 3, 1961 (herself included) were filled by women who had less service with the Lawson Milk Company.

2. Our own contruction of the threat is that the employee was merely warned of a company rule forbidding such activity on company property during working hours, and that violation of such rule would call for immediate discharge.

3. The company claimed that a letter sent to the employees contained the substance of the speech. Other than its reference to the company-employee grievance committee, it is not claimed that such letter contained any improper statements.

be distributed to petitioner's employees.[4] She attended some meetings called by the union, as did others of petitioner's employees. In April, prior to the election of May 17, 1961, a meeting between representatives of the company and the union was arranged by the N. L. R. B. to plan the election. Management representatives, as well as union representatives and their counsel were present. Myrtle Cobb attended. She was the only employee present. She was not, at the time, working. It is not disputed that this was a harmonious and business like meeting, resulting in an agreement as to the time and method of holding the representation election. Following such meeting, and on May 5, 1961, Cobb was recalled for work and continued to be employed through the weeks preceding and following the election. She was laid off, with seventeen other employees, on June 3, 1961, for legitimate business reasons. Prior to such layoff, Mrs. Cobb, through a fellow employee, presented a grievance, complaining that her seniority had not been respected in a recent call-in of part time workers. It was shown that there did not exist seniority among such part time workers, and her supervisor explained that the reason she was not called in was because he was unable to contact her. A reading of Mrs. Cobb's grievance discloses its tone.[5] About the time of such grievance, the employee who was handling it took occasion to speak to the company's personnel director as to whether a part time employee had seniority rights. The name of Myrtle Cobb came up and such personnel director said,

"And he brought out—in other words, that Myrtle Cobb had on other occasions called—he did not tell me when this related to or what it was that had caused the difficulty for the company. And they felt she had something to do with the uprising as to the union, although he said to his knowledge she had not passed out cards."

The trial examiner, affirmed by the Board, made his finding that Cobb's failure of reemployment was discriminatory solely on the basis of her appearance at the pre-election N. L. R. B. meeting and the above remarks of petitioner's personnel director. The examiner, after reciting such incidents, said, "I find, accordingly, that on the basis of the facts narrated *in this paragraph only*, Cobb has not been recalled because she was an active proponent of Local 497 at Respondent's plant."

Petitioner-employer offered evidence in support of its claim that Myrtle Cobb was an unsatisfactory employee and for that reason was not rehired. As a part time worker, she had no seniority rights which would regulate the time or circumstances of her being recalled after a layoff. This was known to Cobb. According to the evidence, the determination of whether Myrtle Cobb should or should not be called in for work was within the authority, and subject to the judgment of two supervisory employees, William Turnage, manager of the pastry department, and William Howard, supervisor of the pastry department. Both of these persons testified that they were the ones who decided not to rehire Myrtle Cobb. Both disclaimed that union activity had anything to do with it, and asserted that they did not know of her activity in that regard. Howard's de-

4. It does not appear that the company was aware of Cobb's activities in this regard, or that it had any discussion or contact with her in regard to such activities.

5. "I was not called according to seniority. Bill Howard phoned and told me to stay home Tuesday—5-30-61—and then called in a girl with no seniority on the same day. Three of us were presented with our five year pins at the same time. Two girls were called according to seniority and I'd like to know why I was replaced by said girl. I have always come in when called. The girl mentioned lost her seniority when she refused to come in because of another job. My anniversary date is November 13, 1955.

"*I want to know what Bill Howard is holding against me?*" (Emphasis supplied.)

scription of his experience with her is set forth in the footnote below.[6]

Turnage described his experience with her.[7]

6. "Q. Now, will you tell why you didn't call Myrtle Cobb after, about as I remember, about around the early part of June?

"A. Yes, sir.

"All right, you just tell, right into the record, what was the reason for your not calling Myrtle Cobb thereafter.

"A. Myrtle Cobb, to my estimate, is an unsatisfactory worker in our pastry department. I state unsatisfactory for this reason: Myrtle Cobb is quite a gossip woman, and she carries gossip, and she directs it throughout the plant. She creates lost time among employees, also the loss of her own time. To take it farther, Myrtle, at different times when I have told her the time to come to work, differed with the time that I asked her to come to work. At one incident, Mr. Turnage was standing behind the rack in our packing department, and previous to him standing there, I had told him about the next day's work, and he told me the time to start the people. If he didn't name the people, it was up to me to tell the desired people to come in. I had told Myrtle what time to come in, and she differed with me about the time in that she referred to—I am not going to use the other person's name, I'll just say it, so, whoever it may be, 'Why can't she come in at this time instead of me?' I told her, I said, 'Myrtle, I usually tell the people what time to come in, and if they don't care to come in at that time, that's a matter that would be completely out of my hand, and it would have to be taken up with Mr. Turnage.' Mr. Turnage, in turn, stepped out from behind the rack and made the statement that if there was any more argument about time of starting from Myrtle Cobb, that there would have to be something done about it. * * *

"Myrtle Cobb, one time, came to work one hour late in the morning. * * * She had a bruise mark on her face, and everybody in the shop seemed to know exactly what happened. It was carried throughout the pastry department, and I think it created quite a bit of talk in the pastry department. * * *

"Q. All right, what other occasions do you have in mind?

"A. These numerous occasions of wanting to come to work at a specified time in place of another girl. Myrtle was just an average all-around worker in the shop. She could not do wrapping work, could not be a cake froster, and does not do tray work. We have girls who we consider our specialty girls in that, and therefore, I would have to bring her in at the time I would most desire to have her. * * *

"Q. Now, will you give us the factors which you consider when you determined not to call Myrtle Cobb in after June 20, or whatever that day was in 1961?

"A. Well, the basis of that would be, first: Mr. Turnage and I, under discussion of help, have classifications in regard to personalities and their ability. We had decided at that time to discontinue Myrtle Cobb from our payroll in the pastry department."

"Q. Based on what?

"A. Well, mainly her means of gossip, creating lost time, and being an undesirable person to have among the other employees. * * *

"Q. When was it?

"A. I would say it must have been in June of this year.

"Q. What time in June?

"A. Evidently it was shortly after her last day of working."

7. "* * * on this occasion there was an argument, and I made the statement to Mrs. Cobb that this kind of thing had to cease, and that we could not continue to have arguments every time a supervisor asked you to change hours or days or whatever case it might be.

"Q. Did you discuss reasons? Just answer yes or not.

"A. Yes.

"Q. What reasons were discussed?

"A. Well, the reason was that—and this was not only with Bill Howard but also with Joe Gallagher, and they came to me a number of times telling me that every time her days or times were changed, there was an argument, and they were getting tired of arguing because it's never the right time.

"Q. What did you say?

"A. I said, 'Unless this ceases, we are going to have to eliminate the girl,' and the thing that capped it off was near her last working days, I don't recall when I came to work that morning. Joe Gallagher came to my office and stated that Myrtle came in an hour late, had a black eye and spread it over the shop, and was interfering with the line, and if that's the case, we will have to do something else.

*     *     *     *     *

"A. I do recall her, and very distinctly, and supervision didn't like to do it, so I said, 'Give the number, and I will call.' The supervisor said, 'I get into an argument when I call.' "

Mrs. Cobb's description of her conduct and her experience with her supervisors presents a somewhat different picture than that portrayed by the descriptions given by Howard and Turnage. She conceded some minor discussions with supervision, and described one incident when she was warned that her "squawking" would have to cease if she was to be continued as an employee.[8]

The trial examiner did not make a specific finding of fact as to the accuracy of Howard's and Turnage's description of Cobb as an employee. He concluded, however, that such misconduct, if it did occur, was not the reason for the petitioner's failure to recall her to work. He determined that petitioner, acting through the mentioned supervisors, was motivated by an illegal and discriminatory purpose. The Board affirmed him. This finding forbids our setting it aside if it is "supported by substantial evidence on the record considered as a whole * * *." (§ 10(e) of the Act, Title 29, U.S.C.A. § 160(e)). We are of the opinion, however, that the Board's finding fails to meet this test.

■ We first observe that the Board was not empowered to order reinstatement *solely* because of its conclusion that respondent's decision to refuse reemployment to Cobb was, in its view, without sufficient cause. N. L. R. B. v. Houston Chronicle Pub. Co., 211 F.2d 848, 854 (C.A.5, 1954); N. L. R. B. v. Wagner Iron Works, 220 F.2d 126, 133 (C.A.7, 1955). The trial examiner here recognized such rule in saying, "[A]n ultimate finding of a discriminatory refusal

to rehire cannot be predicated merely upon a rejection of the Respondent's failure to establish good cause as the ground for not calling Cobb back to work. The General Counsel still has the burden of establishing a discriminatory motive." Such has been the holding of this Court, N. L. R. B. v. Mylan-Sparta Co., 166 F.2d 485, 490, 491 (C.A.6, 1948).

■■ The Board, however, finds discriminatory motive solely from two circumstances: First, that respondent knew that Cobb had attended a meeting arranged by the N. L. R. B. to set up a plan for the election; and Second, because respondent's personnel director, Spiegel, said on one occasion that "they felt that she (Cobb) had something to do with the uprising as to the union." In making this statement, Spiegel was but stating the truth. Its utterance was without animus; it was not made as part of a threat, nor did it indicate the company's intention to visit reprisal on her. We are not persuaded that the company's knowledge of Cobb's attendance at the N. L. R. B. meeting as a union representative insulated her from a managerial decision not to rehire her. N. L. R. B. v. West Ohio Gas Co., 172 F.2d 685, 688 (C.A.6, 1949); N. L. R. B. v. Mylan Sparta Co., 166 F.2d 485, 491 (C.A.6, 1948). It should be pointed out that after Cobb's attendance at the pre-election N. L. R. B. meeting, and with knowledge of such fact, respondent rehired her. After her layoff with other part time employees on June 3, 1961, she, with about 18 other part time workers, was called in by Spiegel on June 20,

---

8. "Q. Now, in February, will you tell us what you remember about this occurrence?

"A. When Mr. Howard told me about the changing of my shift with the girl when her husband would not allow her to work the other shift, Mr. Turnage came from behind the rack and said to Bill Howard, 'Is she squawking about her shift?' I started to say no, and Mr. Howard said, 'Yes,' and Mr. Turnage said, 'If I ever hear you squawking about your shift again,' he said 'you won't be working for me any more.'

"Q. And you think that was in February and not in May?

"A. That was in February.

"Q. Well, when he said, 'If I hear you squawking about your shift again,' had you squawked about your shift at various times before that?

"A. No. That's what I was trying to tell him. All I was saying to Mr. Howard, I was talking about my shift. I was saying about my shift that I was satisfied with my shift that he gave me, but it was about replacing me with this other girl."

1961. He then explained the lack of seniority rights of part time workers and that decision to rehire any of them would be determined by the judgment of supervisors Howard and Turnage. Cobb was then asked, as were the others, whether under such circumstances she would be available if recalled. We cannot find support by substantial evidence for a finding that the decision of Howard and Turnage not to recall Cobb was motivated by a discriminatory purpose—her union activity. In Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, the Supreme Court comprehensively enunciated what we are to consider and the extent and limitations of the review enjoined upon us by the relevant statute. Such decision tells us that in determining whether the findings of the Board are supported by substantial evidence on the record as a whole, we are to consider whether we can "conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record *in its entirety* furnishes, including the body of evidence opposed to the Board's view." (340 U.S. 488, 71 S.Ct. 465, 95 L.Ed. 456.) By Universal Camera, we are admonished that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Obedient to that admonition, we view the incidents relied on by the Board against the background of this employer's fairness in the campaign that preceded the election. Such fairness is demonstrated by the Teamster Union's post-election commendation of respondent's conduct. On the record before us, we are unable to come to a conscientious conclusion that the Board's finding of discrimination against Cobb is supported by substantial evidence on the record considered as a whole. See also, Pittsburgh S.S. Co. v. N. L. R. B., 180 F.2d 731 (C.A.6, 1950), affirmed N. L. R. B. v. Pittsburgh S.S. Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479.

That part of the Board's order finding petitioner Lawson Milk Company guilty of an unfair labor practice in failing to rehire Myrtle Cobb is vacated, and its enforcement is denied. The Board's order is in all other respects affirmed, and its enforcement ordered.