**METROPOLITAN LIFE INSURANCE COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 16761.

United States Court of Appeals Sixth Circuit.

Jan. 6, 1967.

Rehearing Denied April 3, 1967.

See 374 F.2d 693.

Burton A. Zorn, New York City, for petitioner, Harry E. Marble, Cincinnati, Ohio, Larry M. Lavinsky, Marvin Dicker, Thomas F. Delaney, New York City, on the brief, Marble & Vordenberg, Cincinnati, Ohio, Proskauer, Rose, Goetz & Mendelsohn, New York City, of counsel.

Allison W. Brown, Jr., National Labor Relations Board, Washington, D. C., for respondent, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Gary Green, Clarice R. Feldman, Attys., National Labor Relations Board, Washington, D. C., on the brief.

Before EDWARDS and CELE-BREZZE, Circuit Judges, and TAYLOR, District Judge.

ROBERT L. TAYLOR, District Judge.

This case is before the Court on petition of Metropolitan Life Insurance Com-

pany to review and set aside the Decision and Order dated June 25, 1965, of the National Labor Relations Board (hereinafter called Board) holding that petitioner committed unfair labor practices in violation of Sections 8(a) (1) [29 U.S.C. Sec. 158(a) (1)] [1] and 8(a) (3) [29 U.S.C. Sec. 158(a) (3)] [2] of the National Labor Relations Act, as amended; and upon the Board's cross-application for enforcement of its Order.

The proceedings stem from petitioner's refusal to rehire John Nunnally, a former agent who began work for petitioner in 1950 but who voluntarily resigned in December, 1963.

The charges relate, among other things, to a conversation between Nunnally and Speyer with respect to the former's rehiring which allegedly occurred on December 12, 1963 when Nunnally replied as follows to a question by Speyer:

"A. [By Nunnally] He said well what do you know about—how do you feel about the union, and I said well I am for the union. I voted for it. I think it is coming in and most of the agents want it, and he said how active were you in it and I said well I was an observer at the last election. He said well did you sign any card, did you join up with them, and I said no, I didn't sign any card because when the cards were passed around I was down in Alabama, and he said that's good because if you signed a card you would never come back to work for Metropolitan."

The Board found that the interrogation of Nunnally with respect to the Union interfered with, restrained or coerced him in the exercise of his rights as guaranteed by Section 7 of the Act.

It was also found that petitioner discriminated against Nunnally in violation of Section 8(a) (1) and (3) by interrogating him with respect to the Union [3] and in refusing to rehire him because of his Union activities.

Speyer denied making the statements attributed to him by Nunnally.

The Trial Examiner found, and his findings were approved by the Board, that:

"Although Speyer denied at first that he asked Nunnally on December 12, whether he had signed a Union card, at a later point in his testimony he gradually retreated from his position, stating, at first, that he did not recall making any such inquiry, and finally confessing that he was not sure that he had not done so. * * *"

The Trial Examiner stated that Speyer also professed to be unable to recall whether he had asked Nunnally how he felt about the Union, while admitting that he learned of Nunnally's role as an observer for the Union. Speyer denied that he solicited this information, insisting that Nunnally volunteered it in the course of a conversation late in December. Speyer likewise denied that he stated to Nunnally that if he had signed a union card he would not be considered for rehire.

The Board conceded that the Trial Examiner misconstrued a part of Speyer's testimony because Speyer stated positively that he did not ask Nunnally about signing the card during the December 12 interview. He did not change that denial. However, when he was later asked (not about the December 12 interview) if he had ever questioned Nunnally about signing a card, he replied that he

1. "Sec. 8.(a) It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;"
   [Section 7 reads in part as follows: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, * * *"]

2. "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *."

3. Insurance Workers International Union, AFL-CIO.

"wouldn't remember that." He was asked, "Can you say for sure what you didn't ask him?" and replied that he could not.

Trial Examiner considered the last question and answer to be related to the December 12 interview, whereas it actually related to subsequent discussions between Nunnally and Speyer.

It was pointed out by the Board that this aspect of the Trial Examiner's decision was not the sole or the controlling basis for his determination to credit Nunnally's version of the facts and that such "a minor discrepancy was of insufficient importance to warrant a rejection of that credibility determination. * * *"

The Board further found:

" * * * That Nunnally's identification with the Union was at least a contributing reason for the rejection of his application for re-employment, is clear from Speyer's admission that it was against Respondent's policy to rehire a former agent who has signed a Union card, coupled with Pate's admission that he knew Nunnally had signed such a card and the implausibility of the bulk of the reasons assigned by Pate for not rehiring Nunnally. * * * that, by refusing to rehire Nunnally, Respondent violated Section 8(a) (3) and (1) of the Act."

Petitioner was ordered to cease and desist from the unfair labor practices found by the Examiner and from in any manner interfering with, restraining, or coercing the employees in their statutory rights.

Petitioner was further ordered to offer immediate employment to Nunnally in a position subtantially equivalent to that in which he would have been employed, to make him whole for any loss of pay suffered as a result of the discrimination against him; and to post the usual notice.

We are required to determine whether there is substantial evidence to support the findings and conclusions of the Trial Examiner and the Board. There is in the record the following evidence:

In 1950, Nunnally was hired by the petitioner as a debit agent in the Eastgate District Office in Detroit, Michigan. He was employed there when the Union in March, 1962 filed a petition for an election among petitioner's Detroit agents. He testified that Charles L. Pate, petitioner's superintendent for the Great Lakes Territory which included Detroit, discussed the Union at several meetings with the agents in 1962 and characterized the Union's representatives as "thugs" and "strong arm men" who were connected with the rackets of all types and told the employees that petitioner and its agents had never needed a union. One employee testified that Pate stated that "anything we would get, the Company or Mr. Pate would give to us, nobody else would give us a single thing. It [the Union] would never do us any good * * * [and even if] Jesus Christ himself was representing us * * * it wouldn't do any good."

An election held in October, 1962 was set aside by the Board because of the petitioner's alleged misconduct [4] and a second election in June, 1963 resulted in certification of the Union as the bargaining representative. Nunnally acted as a Union observer at the second election and in this capacity signed his name to the Board's official tally of the ballots.

4. Petitioner points out in footnote to its brief that Pate's role in the 1962 election was fully explored by the hearing officer and that although eighteen witnesses testified not one attributed to Pate the remarks which Nunnally stated that he made about the Union. The hearing officer found that Pate was a creditable witness. In response to this statement, respondent observed that the hearing officer's report was not made a part of the record, and, therefore, lodged it with the Clerk. We have examined the report. The hearing officer, among other things, found that "The Company, through Superintendent of Agencies Pate and other officials, at a dinner on or about October 17 to which all the Agents were invited, and at other occasions including regular District Office meetings through statements by the Managers, made very clear that they would not bargain with the Union if the Union won the election. * * * *"

After the first election in November, 1962, Nunnally applied for a transfer to petitioner's agency in Alabama. The application was first denied but about nine months later, or in October, 1963, it was granted. General Counsel conceded during the hearing that he did not mean to infer that there were any dilatory tactics upon the part of petitioner in the transfer. In that connection, the Trial Examiner stated: "There is no indication of stalling. Just a matter of procedure."

Nunnally worked in Huntsville until December of the same year, when he resigned and returned to Detroit. He stated that the Huntsville Manager promised to do anything he could to help him get back with the company in Detroit. He returned to Detroit on December 11 and conferred with Alex Speyer about a job the following day, December 12. Speyer was the manager of petitioner's Gratiot office. Nunnally stated that he did not apply for a job at the petitioner's Gratiot office because he knew there were no job openings at that time.

On December 13, Speyer recommended to his superior, Pate, that Nunnally be rehired. Nunnally's Huntsville Manager had turned in a very good report on him. On January 8, 1964, Speyer was instructed to reject Nunnally's application and not to rehire him. On January 23, 1964, in response to a letter by Nunnally asking why his application for re-employment had been rejected, Pate stated:

"This decision has nothing to do at all with your work in Alabama, or any report, or any alleged detrimental recommendation. It is simply my belief that with your attitude and personal problems you are not suited for the career of the dedicated Life Underwriter."

Pate appended a notation to an interoffice memorandum relating to Nunnally's application dated January 9, 1964 that he "would never consider Mr. Nunnally—has an extremely negative attitude."

Nunnally's sales production record, which was satisfactory until 1961, declined substantially. From 1960 to 1963, he averaged $220,000.00 of production credits, 30% to 40% less than the company average, and far below the average for the Detroit area. His production record fell from $264,000.00 in 1960 to $197,000.00 in 1962.

Greenstein, the District Manager of the Eastgate District, spoke to him on several occasions in 1962 about his low production and suggested that he accept a smaller agency. A smaller agency would give him more time for sales activities and normally increase his total earnings. He was reluctant to reduce his agency, notwithstanding his poor production. On September 6, 1962, Greenstein wrote a letter to Pate, the Company's Superintendent of Agencies for the Great Lakes Territory, informing him of Nunnally's reluctance to make the change and pointing out that "Mr. Nunnally's production this year has been very poor." Nunnally's agency was reduced, notwithstanding his objections. His production in 1963 showed some improvement, but was still below average. In that year, his average production credit was $154,000.00 compared with a company-wide average production record of approximately $325,000.00. His attitude towards his work during his tenure in the Eastgate District was poor. He complained generally about the Company's operations, including "meetings * * * supervision * * * sales material * * * planning his work * * * company policies * * * rules * * * commissions," and the reduction of his debit, all of which had the effect of affecting the morale of the employees in his office.

Nunnally experienced marital difficulties and was divorced in 1961, but remarried his wife in 1962. He requested Pate by letter in November, 1962 to be transferred to the Huntsville District Office, explaining his request as follows:

"My request is for personal and physical reasons and should cast no reflections on my present District or Mr. Greenstein, whom I admire and respect."

He testified that he sought the transfer to Huntsville primarily because he thought that there was a "tremendous growth potential down there" and consequently "it would be a financial boom to me."

His production fell to virtually nothing during the time he spent in Huntsville. He was unhappy in his new location as he had been in Eastgate and on December 6, 1963, he resigned from the employ of the Company.

As previously indicated, he returned to Detroit on December 11, 1963 and was interviewed by Alex Speyer the following day. Speyer had no authority to hire. Pate had the sole authority. Speyer testified that Nunnally's Union activities were not discussed during this interview. Nunnally said they were discussed. Immediately following the interview, Speyer wrote Pate endorsing Nunnally's application and recommending that he be reappointed. During the pendency of his application, Nunnally returned to the Gratiot office several times to learn whether any action had been taken by the home office. Speyer testified that on one of these occasions, Nunnally volunteered that Greenstein did not like him because he had been active in the Union and had been a Union observer during the last election. Speyer stated that he did not solicit this information and did not pursue the matter. However, he admitted in response to the Trial Examiner's question during one of the conversations after December 12 that he could not say for sure that he did not ask Nunnally whether he had signed a card. He was certain that he did not do so on December 12.

Charles Dietz, one of Pate's assistants, recommended over Pate's signature, that Nunnally be re-employed. This recommendation was based upon Speyer's intercession on behalf of Nunnally and was prompted by Speyer's fine reputation as a District Manager.

When Pate returned to the office, he reviewed Nunnally's personal file. He had before him an inter-office memorandum from Dietz, which mentioned Speyer's recommendation of Nunnally, but added "I am told that this Agent while in Eastgate, was to say the least, refractory." Pate revoked Dietz's recommendation and instructed Speyer to cease negotiating with Nunnally and Speyer informed Nunnally that he would not be rehired, but gave him no reason.

Nunnally wrote Pate for the reasons for his refusal to employ him and on January 23, Pate replied and pointed out his "attitude and personal problems" and concluded that he (Nunnally) was not suited for the career of a "dedicated Life Underwriter."

Pate testified that he did not know about any of Nunnally's Union activities until he read the transcript of the record before the Trial Examiner. He also testified in detail that his decision not to rehire Nunnally was based upon his poor production, his constant complaining, his instability and his marital difficulties.

On the single interrogation by Speyer about Nunnally's union activities and Nunnally's reply that he did not sign a Union card—though he admitted this was not true—and Speyer's observation "that's good because if you signed a card you would never come back to work for Metropolitan," the Examiner found and the Board approved that petitioner violated Section 8(a) (1) of the Act which forbids an employer "to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 7" of the Act.

■ It is the general rule with some modifications that the credibility of the witnesses and the reasonable inferences to be drawn from the evidence are questions for the determination of the Board. If there is substantial evidence to support the findings of the Board with respect to questions of fact, such findings are binding upon the Court. N. L. R. B. v. Barberton Plastics Products, Inc., 354 F.2d 66 (C.A.6, 1965); United Fireworks Mfg. Co. v. N. L. R. B., 252 F.2d 428, 430 (C.A.6, 1958); N. L. R. B. v. Wayne W. Wilson Company, 311 F.2d 1 (C.A.6, 1962); N. L. R. B. v. Interurban Gas Corporation, 317 F.2d 724 (C.A.6, 1963);

N. L. R. B. v. Tru-Line Metal Products Co., 324 F.2d 614, 616 (C.A.6, 1963).

■ It is the prerogative of the Board to determine what language was spoken and the prerogative of the Court to determine whether such language amounted to an unfair labor practice within the meaning of Section 8(a) (1). Jacksonville Paper Co. v. National Labor Relations Board, 137 F.2d 148, 150 (C.A.5, 1943).

■ All existing circumstances should be looked to at the time the language is used to determine whether the Act was violated. N. L. R. B. v. Elias Brothers Big Boy, Inc., 325 F.2d 360, 364 (C.A.6, 1963).

The evidence fails to show any organizational activities by the Union at the time of Speyer's interrogation of Nunnally. Such activities ceased following the second Union election in 1963.

■■ We do not believe that Speyer's language restrained, coerced or interfered with Nunnally's rights under the Act. N. L. R. B. v. Tennessee Coach Company, 191 F.2d 546, 555 (C.A.6, 1951). But if we are mistaken in this view, the petitioner would not be responsible for the personal views or opinions of Speyer, and the record fails to show that Speyer voiced the policy of petitioner.

■ It is incumbent upon the General Counsel to show by substantial evidence a statutory violation. Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Lawson Milk Co. v. N. L. R. B., 317 F.2d 756 (C.A.6, 1963).

The Supreme Court has defined the meaning of "substantial evidence" as follows:

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, * * * ' "

■ It is our view that there is no substantial evidence to support the conclusion of the Board that petitioner violated Section 8(a) (1) of the Act. N. L. R. B. v. Columbian Company, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660.

■ This brings us to the question whether petitioner violated Section 8(a) (3) of the Act in refusing to rehire Nunnally. In order to show a Section 8(a) (3) violation, the burden likewise was upon the General Counsel to show that petitioner was motivated by Union animosity or by discriminatory purposes in refusing to rehire Nunnally. Lawson Milk Co. v. N. L. R. B., supra, 317 F.2d 760, 761.

■ The burden is not met by showing that the employer had been convicted of violations of the National Labor Relations Act or was at one time hostile to the Union. N. L. R. B. v. Murray Ohio Mfg. Co., 326 F.2d 509; N. L. R. B. v. Murray Ohio Mfg Co., 328 F.2d 613 (C.A.6, 1964).

■ Suspicion, conjecture or remote inferences may not be substituted for substantial proof of unlawful motivation. Riggs Distler & Company v. N. L. R. B., 327 F.2d 575, 580 (C.A.4, 1963).

■ Such motivation cannot be inferred from testimony of events occurring more than six months prior to the filing of the complaint where such testimony "serves to cloak with illegality that which was otherwise lawful." Local Lodge 1424 v. N. L. R. B., 362 U.S. 411, 416, 417, 80 S.Ct. 822, 827, 4 L.Ed.2d 832 (1960), Sec. 10(b) of the Act [29 U.S.C. 160(b)].[5]

■ Hiring or rehiring policies are matters for management in the absence of anti-Union motivation. N. L. R. B. v. Miranda Fuel Co., 326 F.2d 172, 175

5. "PREVENTION OF UNFAIR LABOR PRACTICES
"Sec. 10. * * *
"(b) * * * no complaint shall issue based upon any unfair labor practice oc- curring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * * "

(C.A.2, 1963); Portable Electric Tools, Inc. v. N. L. R. B., 309 F.2d 423 (C.A.7, 1962); N. L. R. B. v. Cosco Products Co, 280 F.2d 905 (C.A.5, 1960); N. L. R. B. v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 45, 46, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

The Trial Examiner's finding that Nunnally's identification with the Union was at least a contributing reason for the rejection of his application for re-employment and thus a violation of Section 8(a)(3) of the Act, was based upon Speyer's alleged admission that it was against petitioner's policy to rehire a former agent who had signed a union card, coupled with Pate's admission that he knew Nunnally had signed such a card and the implausibility of the numerous reasons assigned by Pate for not rehiring Nunnally. To strengthen his conclusion, the Examiner pointed out that Pate at one time expressed the view that a District Office Manager has fewer problems in an unorganized area than a manager in an organized area. He also pointed out in a footnote that Pate attempted to minimize the significance he attached to Nunnally's Union activity, asserting that he had heard of Nunnally signing a Union card, but that he was not aware that Nunnally was a Union member and had he known that fact or that he was sympathetic to the Union he would not have approved his transfer to Huntsville where there was no Union organization. The Examiner stated that Pate was unable to explain convincingly why he delayed for nine months approving Nunnally's request for a transfer to Huntsville.

As heretofore pointed out, General Counsel conceded that there was no improper motive upon the part of Pate in the delay.

The Examiner stated that the conflicting positions taken by Pate with regard to Nunnally's transfer attests to Pate's lack of candor in that area and to a reluctance to disclose the considerations which actually motivated him in the delay of the approval of the transfer for nine months.

Finally, the Examiner assumed that Pate gave no weight to Nunnally's activity with the Union in acting on his request for a transfer "that circumstances alone would not suffice to negate the evidence cited above as to Respondent's policy in acting on applications by former agents for re-employment. In this connection, it may be noted that at the hearing Pate acknowledged that he applied stricter standards in hiring agents than he did in dealing with agents already on the payroll."

We conclude that Pate had sufficient reasons for refusing to rehire Nunnally. His poor production for the years 1960 through 1963 was a sufficient reason alone. His propensity for troublemaking among the employees and his apparent dissatisfaction with his work as an agent both in the Eastgate District and the Huntsville District would appear to be sufficient reasons for refusal to re-employ.

The recommendations of Speyer, Greenstein (Nunnally's former Manager) and of Charles Dietz (Assistant to Pate) that Nunnally be re-employed indicate strongly that there was no anti-union policy in the company that prevented Nunnally's re-employment. J. D. Knight, Manager of petitioner's office in Decatur, Alabama, under whom Nunnally worked while in Huntsville, apparently gave Nunnally a good report, according to letter to Nunnally of January 13, 1964. (General Counsel Exhibit 2.)

Pate, the only one in the Detroit area who had the right to rehire or not to rehire Nunnally, stated that he had never heard that Nunnally was an active member in the Union; that he first learned that Nunnally was an observer at the last election when he read the transcript before the Examiner; that he knew that the Union was certified as a result of the election. He had heard that Nunnally had signed the Union card back before the election in 1962. This information came to him from Greenstein. At the risk of repetition, we recall the reasons he gave for refusing to re-employ petitioner. He stated that Greenstein told him that

he had had difficulty with Nunnally in the Eastgate District; that his record was getting worse in production sales; that he complained about meetings, supervision, sales material, planning his work, company policy, company rules, commissions, etc. He was not too happy in his position at Eastgate. When he applied for a transfer to Alabama and was first turned down, he stated that he had had marital difficulties and his wife was anxious to go South. Pate then stated:

> "Now, the reason I rejected his reappointment, in addition to what I have been telling you, he did not do well in Alabama and he resigned—he did not ask for transfer, he resigned.

> "When he reapplied, I turned it down and I wrote him a letter giving him part of the reason. I didn't see any point in writing a long, lengthy letter. The letter is a matter of record."

Nunnally's personal file was reviewed by Pate before he made the decision not to re-employ him.

■ The Examiner's findings, adopted by the Board, that Pate's refusal to re-employ Nunnally was motivated at least in part by an anti-union policy was based on inferences which were overcome by the positive testimony of Pate. We therefore find that there is no substantial evidence to support the decision of the Board that petitioner's refusal to re-employ Nunnally was caused by anti-union motivation or that anti-union motivation was a contributing reason.

The characterization of the Union's representatives by Pate as "thugs" and "strong arm men" who were "connected with the rackets of all types" was made in 1962 and could not be the basis of a violation because of Section 10(b) of the Act. N. L. R. B. v. Tennessee Coach Company, supra, 191 F.2d 554; N. L. R. B. v. Mt. Vernon Telephone Corp., 352 F.2d 977 (C.A.6, 1965). In the latter case the Court, speaking through Chief Judge Weick, pointed out that the crediting of a witness by a trial examiner is entitled to great weight by an appellate court, but is not conclusive on the court. "The court may choose not to be bound if it believes that the crediting was improper." (Citing the case of N. L. R. B. v. Elias Brothers Big Boy, Inc., 6 Cir., 327 F.2d 421, at page 426.) The Court reiterated that the determination of a violation of the Act must be based on substantial evidence and not on speculation.

Unless Pate's refusal to rehire Nunnally was motivated either in whole or in part by Nunnally's Union activity there was no violation of the Act in refusing to rehire. We are of the opinion that there is no substantial evidence to show anti-union motivation. N. L. R. B. v. Barberton Plastics Products, Inc., supra; N. L. R. B. v. Dixie Terminal Co., 210 F.2d 538, 540 (C.A.6, 1954), cert. den. 347 U.S. 1015, 74 S.Ct. 871, 98 L.Ed. 1138; N. L. R. B. v. Mylan-Sparta Co., 166 F.2d 485, 491 (C.A.6, 1948).

Petitioner's petition to set aside the order entered by the Board is granted, and the Board's cross-petition for enforcement thereof is denied.

EDWARDS, Circuit Judge (dissenting).

Metropolitan's petition in this action to set aside an order entered by the Board and the Board's cross-petition for enforcement of the same order were argued jointly. The dispute herein hinges upon whether or not Metropolitan refused to rehire as a life underwriter a former employee named Nunnally because of anti-union bias prohibited by the National Labor Relations Act §§ 8(a) (1) and 8(a) (3), 61 Stat. 140–141 (1947), 29 U.S.C. §§ 158(a) (1) and 158(a) (3) (1964), or whether their refusal to rehire him was based upon his own personal problems and/or prior unsatisfactory work record. The issue was litigated with heat and at length, and the Board affirmed findings of the Trial Examiner which held the company in violation and required it to rehire Nunnally with back pay.

Metropolitan's position was that the record discloses that Nunnally, after a satisfactory work record with Metropoli-

tan for some years, suffered a sharp decline in performance so that his "production" fell to 30 to 40 per cent behind the national average during the years of 1961 to 1963. During this period he was divorced from his wife and requested a transfer to the Huntsville, Alabama, office of Metropolitan, where he remained only briefly before resigning from the company.

The company argues that the unsatisfactory production record referred to above in 1961–1963, plus personal problems, plus the fact that the most damaging evidence pertaining to the company's attitude came from Nunnally himself (obviously an interested party!) requires this court to hold that there was not substantial evidence to uphold the findings of the Board. In general, my colleagues agree, finding "no substantial evidence to uphold the findings of the Board." Respectfully, I dissent.

The Board and the examiner relied on Nunnally's testimony that the office manager, Alex Speyer, to whom he applied for reinstatement, asked him whether he had signed a union card, and when he denied it said, "[T]hat's good because if you signed a card you would never come back to work for Metropolitan." The Board and examiner also point out that Pate, the general manager of the district, who made the final decision against rehiring Nunnally, had previously during Nunnally's activity on behalf of the union prior to his resignation, expressed the view that the union representatives were "thugs" and "strong arm men" and "connected with the rackets of all types."

The Board contends that Speyer's language, if it represented company policy, did interfere with Nunnally's rights under the Act; and that petitioner may be held responsible for Speyer's statements since he was the manager of the Gratiot district of Metropolitan Life. N. L. R. B. v. Solo Cup, 237 F.2d 521 (C.A.8, 1956); N. L. R. B. v. Byrds Mfg. Corp., 324 F.2d 329 (C.A.8, 1963).

In addition, the Board relies on the fact that four of the Metropolitan supervisors recommended rehiring Nunnally, but Pate, who knew of his union activities, turned the recommendations down.

This case is not without difficulty. But while I have no doubt that my colleagues are right in saying that Metropolitan had "sufficient reasons," aside from any anti-union bias, not to rehire Nunnally, as I understand the appellate posture of this case, this is not our test. The record seems to me clearly to afford "substantial evidence" to support the findings of fact and inferences of the NLRB.

I would grant enforcement.