**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ACLANG, INC., Respondent.**
**No. 72–1266**
**Summary Calendar.**\*

United States Court of Appeals,
Fifth Circuit.

Sept. 12, 1972.

---

\* Rule 18, 5 Cir., *see* Isbell Enterprises Inc. v. Citizens Casualty Co. of New York, 5 Cir. 1970, 431 F.2d 409.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., C. Woodrow Greene, Director, James W. Mast, Regional Atty., Lewis S. Harris, Asst. Regional Atty., John L. Hollis, Atty., Region 28, N.L.R.B., Albuquerque, N. M., Peter G. Nash, Gen. Counsel, N. L.R.B., for petitioner.

Norman N. Rosen, El Paso, Tex., for respondent.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

The National Labor Relations Board has petitioned for enforcement of its order that Aclang, Inc., a Vietnamese language school operating in Biggs Field, Texas, (1) cease and desist from unfair labor practices under sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act with regard to two

employees,[1] (2) hire and restore back pay to two employees allegedly refused employment because of the company's unfair practices, and (3) post appropriate notices. Finding the Board's factual determinations supported by the record and its conclusions of law correct, we enforce.

Aclang received a contract to teach Vietnamese to military personnel at Biggs Field, near El Paso, Texas. The firm that held the previous contract had signed a collective bargaining agreement with the Union of Language Teachers, American Federation of Teachers, Local 1949, A.F.L.-C.I.O. (hereafter, the union). Aclang recognized and negotiated with the union, resulting in a collective bargaining agreement between the two.

The union, belying its name, is divided along the lines of the immigration status of the members. Those teachers with secure visa status and no requirement that they retain a job to remain in the United States comprise one group. The second and dominant group consists of teachers with temporary visas that require retention of a job in order to remain in the United States. Nguyen Thi

Ky-My was the leader of the minority "secure" faction, which was generally more forceful with management because of the nature of its status. The "insecure" faction was headed by the union's officers. In July of 1971, Ky-My went directly to Aclang to seek employment, bypassing the union. At a union meeting after that, several members spoke against Ky-My as "going against the interests of the union." Ky-My spoke in her own defense, and the meeting became personal and bitter. At another union meeting soon after that, several union members circulated a petition to expel Ky-My from the union, which petition gathered over 60 signatures but failed to pass. Aclang knew of the split within the union's membership, of Ky-My's position as "secure" faction spokeswoman, of the stormy union meetings involving Ky-My, and of the attempt to expel Ky-My from the union.

In August of 1971, following Ky-My's application to Aclang, the union made written application for teaching positions for Ky-My and several other union members. Ky-My made another personal inquiry regarding available positions in September and was told by Aclang's pri-

1. "(a) It shall be an unfair labor practice for an employer—
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
    \*    \*    \*    \*    \*
    (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; [. . .]"

mary executive that there were no openings. Upon returning for another inquiry in October, Ky-My was told by that executive:

"I am not going to hire you because some teachers told me they would walk out on the job if I hired you."

Aclang advised the United States Department of Labor in a letter that it did not plan to hire Ky-My for essentially that reason, also asserting that Ky-My had an unpleasant personality as well.

At the hearings before the trial examiner and the Board, Aclang contended the Ky-My's allegedly abrasive personality was the primary reason for their refusal to hire her, but they acknowledged that potential discord emanating from the stormy union proceedings involving Ky-My played a role. The trial examiner and the Board found that Aclang

". . . refused to hire Miss Ky-My because of [its] apprehension of discord from other teachers who resented Miss Ky-My's conduct at the July 17 union meeting and because of the petition to expel Miss Ky-My from the Union."

▮ Employers may, of course, hire and fire as they choose if they have sufficient lawful reason, which includes refusals to hire so-called "trouble-makers." *See* Metropolitan Life Ins. Co. v. N.L.R.B., 6 Cir. 1967, 371 F.2d 573; N.L.R.B. v. Corning Glass Works, 1 Cir. 1961, 293 F.2d 784; cf. N.L.R.B. v. Cosco Products Co., 5 Cir. 1960, 280 F.2d 905; N.L.R.B. v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 45, 57 S.Ct. 615, 81 L.Ed. 893. However, "trouble-making" *obviously cannot be synonymous with lawful union activity.* The trial examiner and the Board both found that Ky-My's actions at the union meeting in July of 1971 were the cause of her failure to be hired. Her union activities, however vociferous, are protected activity within the scope of the act. See sections 7, 8(b)(1), and 8(b)(2), 29 U.S. C.A. §§ 157, 158(b)(1), 158(b)(2):

"There seems to be no doubt that an employer who denies employment . . . because the applicant or employee has been expelled from a union for causes other than failure to tender dues and initiation fees or is otherwise in disfavor with the union because of activities protected by § 7, finds himself in violation of § 8(a)(1) and (3), even though he acts under the economic duress of a threatened work stoppage . . . [citing cases]."

N.L.R.B. v. Local 138, Operating Engineers (Zara Contracting Co.), 2 Cir. 1961, 293 F.2d 187, 197. If expulsion from a union for lawful Section 7 activity cannot provide justification for an employer's failure to hire, then certainly a heated intra-union argument and an attempted expulsion cannot provide any lawful justification for refusal to hire. Therefore, Aclang's refusal to hire Ky-My for the reasons found by the Board is a violation of Section 8(a)(1).

Whether Aclang also violated Section 8(a)(3) under this set of facts is a more difficult question. Two Circuits have held that unlawful company response to protected intra-union or employee activity, clearly violative of Section 8(a)(1), was not a violation of Section 8(a)(3) in the absence of more specific proof that the employer intended his actions to affect the status of the union and not simply the employee's right to engage in certain action within the union:

"With an undisputed entrenched union, we do not see how the overall effect of this [discriminatory activity by the company] could be to discourage 'membership' in the union, section 8(a)(3); it serves rather to deter the full and free exercise of employees' rights, section 8(a)(1)."

N.L.R.B. v. Corning Glass Works, 1 Cir. 1961, 293 F.2d 784, 787. Accord N.L.R. B. v. J. I. Case Co., 8 Cir., 1952, 198 F. 2d 919. The First Circuit was faced with a single "entrenched" union. Although the record indicates that there is but a single union in the instant case, we conclude that the Aclang union is far

from "entrenched." The precarious status of the "insecure" visa-holders, who comprise the majority of and the officers of the union, clearly bifurcates and weakens the strength of the union in its bargaining with the company.

Even though we are faced with a slightly different set of facts than those before the First Circuit, we feel compelled to disagree with the law enunciated in N.L.R.B. v. Corning Glass, *supra*. We conclude instead that the employer's actions in the instant case constitute violations of Section 8(a)(3) as well as 8(a)(1).

The Supreme Court, in treating Sections 8(a)(3) and 8(b)(2)[2] as coterminous for purposes of defining actions that constitute unfair labor practices by both union and management, concluded that the phrase "membership in any labor organization" in Section 8(a)(3) includes

". . . discrimination to discourage *participation in union activities* as well as to discourage adhesion to union membership. Similar principles govern the interpretation of union membership where [the] encouragement is alleged. The policy of the Act is to insulate employees' jobs from their organizational rights. Thus §§ 8(a)(3) and 8(b)(2) were designed to allow employees to freely exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood."

Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B., 1953, 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455, 477. And it is "participation in union activities" and insulation of "employees" jobs from their organizational rights, as defined by Section 7,

that Section 8(a)(1) also endeavors to protect. *Radio Officers* defines "membership" as "membership in good standing." See N.L.R.B. v. Radio Officers' Union, 2 Cir. 1952, 196 F.2d 960, aff'd, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455. We find ourselves in agreement with the Second Circuit regarding the proper interpretation of Section 8(a)(3):

"The denial of a promotion to an employee because he has charges [pending] against him in the union is a discrimination designed to encourage his membership in good standing in the union. . . ."

N.L.R.B. v. Bell Aircraft Corp., 2 Cir. 1953, 206 F.2d 235, 238. Likewise, Aclang's refusal to hire Ky-My was an effort "to encourage . . . membership [in good standing, Radio Officers' Union v. N.L.R.B., *supra*] in any labor organization," therefore violative of Section 8(a)(3). *Accord* N.L.R.B. v. Imparato Stevedoring Corp., 3 Cir. 1957, 250 F.2d 297; *cf.* N.L.R.B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; N.L.R.B. v. Robinson, 6 Cir. 1958, 251 F.2d 639; N.L.R.B. v. Newton, 5 Cir. 1954, 214 F.2d 472.

■ Section 8(a)(3) imposes a duty upon management not to discourage or encourage union membership by its hiring procedures. And by "membership" we mean effective, not docile, membership. If the company were permitted to encourage union eunuchs, the basic purpose of the whole Act would be emasculated. Effective and representative union organization can be deterred by the company's conplacency toward the union's treatment of its dissenting members as well as by overt action directed at the union itself.

---

2. "(b) It shall be an unfair labor practice for a labor organization or its agents—
　*　　*　　*　　*　　*
　(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; [. . .]."

By the same reasoning, it makes no difference under the facts of this case that the pressure to which Aclang succumbed came from union members and not from the union organization itself. The Board found that Aclang had specific knowledge of certain crucial factors within the union, including the effort to expel Ky-My, and it is not necessary that the union itself formally exert the unlawful influence. *See* N.L.R.B. v. Bell Aircraft Corp., *supra*; N.L.R.B. v. Newton, 5 Cir. 1954, 214 F.2d 472. The company cannot be permitted to engage in hiring and firing procedures that, although approved by the union, operate as brakes to effective union membership.

■ If the employer retains his right to hire and fire, he cannot escape his accountability under Section 8 for his punishment of activity protected under Section 7 by arguing that he merely responded to the wishes of a group of vocal employees or of the union itself. By acquiescing to employee or union pressure under such circumstances, even if done only in the hope of avoiding future labor conflict, the employer restricts the Section 7 rights of the affected individual employee in violation of Section 8(a) (1). And by so acquiescing the employer cannot but encourage adherence to whatever union faction appears to hold sway over employment, thereby violating Section 8(a)(3) as well.

In addition to the dispute surrounding Aclang's refusal to hire Ky-My, another alleged unfair labor practice has been appealed by the Board for enforcement. The trial examiner found that Nguyen Thi Kim-Cuc, a temporary visa-holder, was threatened with loss of her job and her visa status if she did not vote in favor of Aclang's proposed collective-bargaining agreement with the union, which had been rejected overwhelmingly in August by the union membership. Contrary to Aclang's assertions, we find ample evidence in the record to support that conclusion, given the discretion of the trial examiner and the Board in matters of credibility. *See, e. g.,* N.L.R.B. v. Standard Forge & Axle Co., 5

Cir. 1969, 420 F.2d 508, cert. denied, 400 U.S. 903, 91 S.Ct. 140, 27 L.Ed.2d 140; N.L.R.B. v. Monroe Auto Equipment, 5 Cir. 1968, 392 F.2d 559, cert. denied, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270.

■ ■ Aclang also alleges that the company employee who threatened Kim-Cuc, one Gary Moore, was not acting in behalf of the company or as its responsible agent. The management structure of Aclang appears from the record to be a bit uncertain. We conclude, however, that the employee in question had sufficient managerial responsibility at Aclang to sustain the Board's finding that he had at least apparent authority to speak for the company in matters regarding visa status. He was employed at the front office specifically to handle the immigration visa status of the instructors and had rendered various services and advice in that capacity. Moore is a close friend of Aclang's owners and is paid $75 per week for a 10-hour week, a salary rate markedly higher than that of other employees; his wife is Aclang's secretary. In addition, Moore was a vice-president of Aclang's predecessor corporation, the Academy of Language Studies, Inc. Finally, the Board found that Moore threatened Kim-Cuc after he had called her and a number of other instructors into his office ostensibly to discuss their visa status. The Board found, and the record supports the finding, that Aclang's owner instructed Moore to call a meeting. Aclang insists vigorously that Moore's executive position in the company did not authorize him to issue such threats and, therefore, that Moore's actions are not attributable to the company.

"In determining whether any person is acting as an agent of the employer, the question of whether the specific acts performed were actually authorized or subsequently ratified is not controlling."

N.L.R.B. v. Mississippi Products, Inc., 5 Cir. 1954, 213 F.2d 670, 673; *see* N.L.R.B. v. Birmingham Publishing Co., 5 Cir. 1958, 262 F.2d 2; *see also* N.L.R.B.

v. Solo Cup Co., 8 Cir. 1956, 237 F.2d 521; 29 U.S.C.A. § 152(13). On the facts of the instant case, we conclude that the Board had sufficient evidence to infer that Moore threatened Kim-Cuc and that Aclang ". . . may fairly be said to be responsible. . ." for that threat. International Ass'n of Machinists, Tool and Die Makers v. N.L.R.B., 1940, 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50, 56. The orders of the Board are enforced.

Enforced.